# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# COLUMBIA DIVISION

| | |
|---|---|
| GRACIE HUNT, | ) |
| Plaintiff, | ) |
| v. | ) No. 1:15-cv-00092 |
| | ) CHIEF JUDGE CRENSHAW |
| LOWE'S HOME CENTERS, LLC and WHIRLPOOL CORPORATION, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This products liability dispute hinges on a simple factual question: whether a Whirlpool freezer that Gracie Hunt bought at a Lowe's Home Center ("Lowe's") leaked refrigerant in her home, causing her injuries. (Doc. No. 1.) The Court has diversity jurisdiction over this case, pursuant to 28 U.S.C. § 1332(a). (Doc. No. 72.) Lowes Home Centers, LLC, and Whirlpool Corporation collectively ask the Court to resolve the factual dispute on summary judgment. (Doc. No. 47.) Defendants and Hunt also each filed a motion to strike certain documents pertaining to the summary judgment record. (Doc. Nos. 54, 67.) For the following reasons, all motions are **DENIED.** This case will proceed to jury trial as scheduled.

### I. UNDISPUTED FACTS

On January 24, 2015, Lowe's delivered a new, sixteen cubic foot upright Whirlpool freezer to Hunt's home. (Doc. No. 49-1 at 1-2.) The Lowe's employees turned the freezer on and noticed it appeared to be working properly. (Doc. No. 47-8 at 12; 49-4 at 3.) The employee who turned on the freezer could tell that the freezer was blowing cold air, but was not sure if the air was cold because it was snowing outside, making everything cold, or because the freezer was working

properly. (Doc. No. 49-4.) The employee told Hunt that it would take about twenty-four hours to reach its desired freezing temperature, zero degrees Fahrenheit, and she should put her frozen food from her other kitchen freezer in her new one to speed up that process. (Doc. No. 49-1 at 7.) Hunt placed a few frozen items on each side of the freezer. (Doc. No. 49-1 at 7.) When she checked an hour later, the items were still frozen and the freezer appeared to be working properly. (Doc. No. 49-1 at 7.)

At around 5:00 p.m., Hunt and her son, Billy Birdsong, noticed a funny smell, but were unsure what was causing the smell. (Doc. No. 49-1 at 7-8.) Around 9:00 p.m., after Birdsong left, Hunt started feeling ill with a headache. (Doc. No. 49-1 at 8.) She fell asleep around 10:00 p.m., but woke up at 3:00 a.m. with her lungs and throat burning and a headache. (Doc. No. 49-1 at 8.) She asked Birdsong to come back to her house to help her. (Doc. No. 49-1 at 8.) When Birdsong arrived, he searched the residence for the cause of his mom's breathing problems and noticed that all the food in the new freezer had thawed out. (Doc. No. 49-1 at 8.) He pulled the freezer away from the wall and saw a stain on the black cardboard panel of the machine compartment. (Doc. No. 49-1 at 8.) He believed the refrigerant in the freezer (aka, Freon) must have leaked out, causing the freezer to stop working and the frozen food to thaw. (Doc. No. 49-1 at 9.)

Later on January 25, Hunt's throat, lungs, nose, and chest were burning; her head was pounding; she had wheezing and shortness of breath; and she was tired, jumpy, and jittery. (Doc. No. 49-1 at 9.) Hunt has had asthma attacks before this event, however, she has never been hospitalized because of her asthma. (Doc. No. 49-1 at 9.) Only two days earlier, however, she had to go to Urgent Care because of her headaches, coughing, congestion, vomiting and diarrhea. (Doc. No. 10.) As a result of the current symptoms, she was taken to the Southern Regional/Hillside

Hospital, where her doctor put her on oxygen, hooked up an IV, and called the Tennessee Poison Control. (Doc. No. 49-1 at 9.)

    II.      MOTIONS TO STRIKE

Each side presented competing experts to determine where the leak of the refrigerant occurred. Plaintiff's expert, J.A.M. Boulet, Ph.D., prepared a Report dated February 24, 2017. (Doc. No. 49-9.) Boulet opined that the "leak probably originated at a crack in the noted solder joint in the charge tube." (Doc. No. 49-9 at 7.) He continued that the "cracks in the solder joint of the charge tube were most likely not caused by bending of the tube due to contact with the [fibrous] panel after the panel was installed." (Doc. No. 49-9 at 9.) Boulet concluded that the cracks in the solder joint "would have allowed a mixture of oil and refrigerant . . . to leak from the compressor into the room where the freezer was initially installed." (Doc. No. 49-9 at 13.) "Due to the nature of the refrigerant, any mixture that leaked from the compressor would have expanded into the room in which the freezer sat and would have been recirculated to the entire . . . residence via its HVAC system." (Doc. No. 49-9 at 13.)

Defendants then deposed Boulet. At the deposition, Boulet testified that "the cracks were inflicted when the panel was not in place. Whether that was at the factory or later, I have no way of knowing. According to [a deposition Boulet reviewed], it would have to have been at the factory, but I don't know that." (Doc. No. 49-7 at 3.) He continued that the "freezer worked [inside Hunt's residence], according to the depositions that [he] read, when it was installed." (Doc. No. 49-7 at 8-9.) If true, the freezer would have begun running with coolant in it, but when the freezer "ceased to have the effect of cooling, that implies . . . that the coolant leaked while it was running in the . . . residence." (Doc. No. 49-7 at 8.)

After the deposition, Boulet prepared a "Supplemental Report." (Doc. No. 61-1.) In it, he stated that he believes that the "bending of the charge tube [at the Whirlpool factory] weakened the tube at the point where the cracks ultimately appeared," but did not cause the cracks to occur at the Whirlpool factory. (Doc. No. 61-1 at 3.) Instead, "[e]xposure to heat and cold while in transit and/or storage would result in expansion and contraction of the copper tubing and so would further weaken the point in the charge tube where it ultimately cracked." (Doc. No. 61-1 at 3.) He also noted that the fibrous panel buckled because not all the screws were in place, and because of the "increased flexibility" as a result of the buckling, "it is possible that at a time when the fiberboard panel was not fully secured, bending of the charge tube occurred as a result of contact with the panel." (Doc. No. 61-1 at 3.) Finally, according to the depositions, "the only time that the system was under extensive pressure was when it was in operation inside the residence of Gracie Hunt." (Doc. No. 61-1 at 4.) Therefore, Boulet opined that the "oil and refrigerant sprayed on the fiberboard panel and into the home when the charged tube was cracked under extensive pressure inside [Hunt's] residence." (Doc. No. 61-1 at 4.) On August 2, 2017, Boulet prepared and signed under oath an Affidavit that largely reflected his supplemental report. (Doc. No. 49-6.)

Defendants move to strike Boulet's Affidavit. (Doc. No. 54.) However, Defendants do not move to strike Boulet's July 3, 2017 Supplemental Report. Instead, Defendants argue that because the Affidavit is <u>not</u> a supplemental expert report, under Federal Rule of Civil Procedure 26, and was filed <u>after</u> Defendants filed for summary judgment, it is an "ambush attempt" to "surprise Whirlpool." (Doc. No. 54-1 at 13.)

To the contrary, Hunt served Boulet's Supplemental Report on Defendants on July 5, 2017, two days before Defendants moved for summary judgment. Additionally, while it is apparent from the filings (Doc. Nos. 54-1, 61, 65, 67) that both sides were sloppy in meeting deadlines to disclose

experts, submit expert reports, and make experts available for deposition, the Court is not now in a position to determine which party is to blame for any missed deadline. As shown in the March 2, 2017 Joint Statement, it appears that any delay was largely due to Plaintiff's original expert becoming ill and not being able to serve as an expert any longer. (Doc. No. 42.)

Defendants move to strike Boulet's Affidavit for being contrary to deposition testimony. The motion is denied because the opinion in the Affidavit is consistent with her July 3, 2017 Supplemental Report. To the extent Defendants move to strike Boulet's Affidavit as untimely, any late Supplemental Report appears to be harmless because it was served on Defendants prior to their filing of the motion for summary judgment, and substantially justified due to Boulet's limited time (and late arrival) in the case after the previous expert's unexpected illness. FED. R. CIV. P. 37(c)(1). Defendants' Motion to Strike is denied at this stage. Hunt's Motion to Strike Defendants' Reply (Doc. No. 67) is denied as moot.

### III. ANALYSIS

With the denial of Defendants' Motion to Strike, summary judgment becomes entirely inappropriate. Summary judgment is only appropriate if, after construing all the facts in favor of Hunt, Defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must construe all facts and inferences in favor the nomoving party, Van Gorder v. Grand Truck W. R.R., Inc., 509 F.3d 265, 268 (6th Cir. 2007), without weighing evidence or judgment the credibility of the witnesses, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment. Rogers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003).

Defendants move for summary judgment only with respect to liability that the crack in the charge tube occurred at the Whirlpool factory, leaking the refrigerant there rather than in Hunt's

home. (Doc. No. 47-2 at 9-17.) This position is consistent with the opinion of Defendants' expert Lawrence Schentrup, the Global Product Safety Manager for Refrigeration Products for Whirlpool. (Doc. No. 47-13.) However, as discussed above, Boulet's supplemental report opined that the crack had to have occurred at Hunt's residence. This cates a disputed material fact, in which a reasonable jury could find for either party, summary judgment must be denied.

There is also competing circumstantial evidence, with Birdsong and Hunt testifying that the freezer was working in Hunt's residence, and other evidence that Hunt two days earlier visited urgent care for similar symptoms without the refrigerator in place. In Tennessee, a plaintiff can prove her product liability case through circumstantial evidence. Sigler v. Am. Honda Motor Co., 532 F.3d 469, 483 (6th Cir. 2008) (citing reference omitted). Therefore, even if the Court disallowed Boulet's Affidavit based on his Supplemental Report, summary judgment would still be denied.

Defendants' reliance on the idiosyncratic plaintiff rule in Tennessee is also misplaced. (Doc. No. 47-2 at 17-22.) The idiosyncratic plaintiff rule relates to the "unreasonably dangerous" phrase in the products liability statute, which is defined as "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases is." TENN. CODE ANN. § 29-28-102(8) (2012). However, this rule does not apply if the product is defective. See Taylor v. TECO Barge Line, Inc., 517 F.3d 372, 387 (6th Cir. 2008) (refusing to give idiosyncratic plaintiff jury instruction when the product was harmful, even if the plaintiff had abnormal sensitivities). Tennessee law only requires that a products liability plaintiff prove that the product is unreasonably dangerous or defective, not both. Smith v. Detroit Marine Eng'g Corp., 712 S.W.2d 472, 474-75 (Tenn. Ct. App. 1985) (citing TENN. CODE ANN. § 29-28-105(a)). As Hunt is claiming

that her Whirlpool freezer was a defective product, if the freezer leaked the refrigerant inside the house, Defendants would be liable. Therefore, summary judgment is denied.

IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. No. 47), their Motion to Strike (Doc. No. 54), and Plaintiff's Motion to Strike (Doc. No. 67) are **DENIED**. This case remains set for trial on January 23, 2018, and the Final Pretrial Conference remains set on January 12, 2017. In order to facilitate the possibility of settlement and to obtain admissions of fact or stipulations regarding the authenticity and admissibility of documents, this case is **RETURNED** to the Magistrate Judge to conduct a Final Case Management Conference in accordance with Local Rule 16.01(d)(6).

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE